Filed 6/5/15  P. v. Evans CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059992 |
| v. | (Super.Ct.No. RIF1301236) |
| CRAISEAN RYAN EVANS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Eric A. Swenson and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Craisean Ryan Evans was the driver when a fellow gang member in his car fired eight to ten shots at another car. Miraculously, no one in the victims' car was hurt.

A jury found defendant guilty as follows:

Counts 1 and 2: Willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)), each with an enhancement for a gang-related crime in which a principal personally and intentionally discharged a firearm (Pen. Code, § 12022.53, subds. (c) & (e)) and a gang enhancement (Pen. Code, § 186.22, subd. (b));

Count 3: Discharging a firearm at an occupied motor vehicle (Pen. Code, § 246), with a gang enhancement;

Count 4: Active gang participation (Pen. Code, § 186.22, subd. (a)); and

Count 5: Unlawful possession of a firearm (Pen. Code, § 29800, subd. (a)(1).)

In a bifurcated proceeding, after defendant waived a jury, the trial court found one "strike" prior (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), one prior serious felony conviction enhancement (Pen. Code, § 667, subd. (a)), and one 1-year prior prison term enhancement (Pen. Code, § 667.5, subd. (b)) to be true.

As a result, defendant was sentenced to a total of 105 years to life in prison.

Defendant now contends that his trial counsel rendered ineffective assistance by failing to object:

1. To a witness's identification of defendant that was based on an unduly suggestive photo lineup.

2.  To hearsay testimony by the gang expert that violated the confrontation clause.

3.  To prosecutorial vouching and misstatement of fact in closing argument.

We find no ineffective assistance.  Hence, we will affirm.

I

FACTUAL BACKGROUND

On March 20, 2013, around 2:00 p.m., Stewart Chambers[1] was outside an apartment building in Moreno Valley, waiting for his friend Gary Hare to pick him up. While he waited, he was "hanging out" with his brothers-in-law, Isaiah and David Braxton, and a friend of theirs, whom Chambers knew only as "Milky Way."  Both Isaiah and Milky Way were associated with a gang called East Side Lavish (ESL).

Milky Way "threw his hands up" to a black four-door car going by.  The car made a U-turn and stopped 10 or 15 feet away.  There were three people inside the car, all Black:  a male driver, a female in the front passenger seat, and a male in the back seat.

Isaiah and Milky Way walked up to the car.  Someone in the car asked Milky Way where he was from; he replied, "East Side Lavish."

The male in the back seat said he was from Adrienne Avenue.  He pulled out a gun.

The driver said, "I'm from Wild Flax."  He added, "[If] you all have a problem with Wild Flax, . . . then you have a problem with us[.]"  However, he warned Isaiah,

_____

**1**       When Chambers testified, he was facing unspecified "felony charges" based on an incident in which he hit one neighbor and stabbed another.

3

"You're just a kid. You don't even know what you're talking about. You could get killed talking that shit."

After about four minutes of "bickering," Hare arrived. He was driving a green Honda Civic. Chambers got into the passenger seat. Hare's "little nephew," who was in first or second grade, was in the back seat. Chambers saw the black car backing up; the driver was looking directly at him.

Hare drove a little way, but then pulled over, because he "had to fix his seat belt or something." About a minute later, the black car pulled up alongside. Someone in the black car fired eight to ten shots. No one in the green car was hit, but several of the car windows were shot out.

Chambers gave the police descriptions of the two males. He described the driver as a light-skinned Black male with tattoos on his face and neck. In a photo lineup, Chambers identified the driver as defendant. He said he was "a hundred percent sure." At trial, Chambers once again identified defendant as the driver.

In a separate photo lineup, Chambers identified the shooter as one Jermarr Session. Again, he said he was "a hundred percent sure[.]"

A neighbor who had witnessed the shooting likewise identified the shooter as Session, but she was unable to identify the driver.

Another neighbor's surveillance videos from the date and time of the shooting showed a black four-door Dodge Avenger speeding away from the scene.

The next day, the police went to the address where defendant lived with one Trina Gipson. A black four-door Dodge Avenger was parked in the driveway. Inside the car, they found receipts in the name of Catrina Gipson for a stay at a Best Western Motel from March 19-21; the motel was two miles away from the scene of the shooting. A surveillance video from the Best Western showed that defendant and Session were there together about five hours after the shooting.

The prosecution called Deputy Robert Navarrete as a gang expert. He identified the Edgemont Criminals (Edgemont) as a gang in Moreno Valley with approximately 100 members. Edgemont's primary activity was the commission of crimes, including murder, attempted murder, assaults with a deadly weapon, robberies, and burglaries.

A pattern of criminal gang activity was shown by the following convictions:

1. Djontrae Cole-Evans, a member of Edgemont, had been convicted of shooting at an occupied vehicle. The crime was committed on January 22, 2012.

2. Bomani Boyd, a member of Edgemont, had been convicted of attempted murder. The crime was committed on December 29, 2011.

3. Niko Smith, a member of Edgemont, had been convicted of attempted murder. The crime was committed on February 15, 2007.

Adrienne Avenue is known to be Edgemont territory, and members of the gang "represent" Adrienne Avenue. According to the gang expert, Edgemont was at "war" with another gang called Sex Cash Money (Sex Cash). A gang called Wild Flax was affiliated with Edgemont. On the other hand, ESL was affiliated with Sex Cash. In

5

addition to the general enmity between Edgemont and Sex Cash, Wild Flax and ESL "ha[d] a beef" with each other.

The gang expert testified that defendant was a member of Edgemont. He explained that defendant had a total of 11 Edgemont-related tattoos. Defendant had admitted to police officers that he was a member of Edgemont, twice in 2006 and twice in 2012. Moreover, defendant associated with Edgemont members.

The gang expert added that Session, too, was a member of Edgemont. Session had told the gang expert that defendant was "one of his closest homeboys."

In the gang expert's opinion, the shooting in this case was committed for the benefit of Edgemont. He also testified that "[w]hen gang members . . . [a]re driving around in a car, and somebody has a gun, it's known to everybody in the car that somebody has a gun."

II

FAILURE TO OBJECT TO THE PHOTO LINEUP AS UNDULY SUGGESTIVE

Defendant contends that his trial counsel rendered ineffective assistance by failing to object that the lineup with defendant's photo was unduly suggestive.

A.    *Additional Factual and Procedural Background*.

As mentioned, Chambers picked defendant out of a photo lineup. Chambers also identified defendant in court.

Chambers had described the driver to a police officer as a light-skinned Black male with tattoos on his face and neck. The officer then created a photo lineup using a

6

computer program. He included defendant in the photo lineup because he determined, after consulting with other members of the gang task force, that defendant matched the description.**2**

The photo lineup was a "six-pack." Of the six men shown, defendant had the second-lightest skin. Three had some facial hair. Four had no visible tattoos. One had a prominent tattoo of a crown over one eye. Defendant had a less prominent circle tattoo under one eye. He also had detailed tattoos all over his neck; in the picture, however, these are easily mistaken, absent careful inspection, for a shadow under his jaw.

Before viewing the lineup, Chambers was given a standard cautionary admonition.

Defense counsel did not object to evidence of the photo lineup nor to Chambers's in-court identification.

B.      *Analysis.*

Defense counsel forfeited any error in admitting the challenged evidence by failing to object. (Evid. Code, § 353, subd. (a); *People v. Elliott* (2012) 53 Cal.4th 535, 585-586.) Defendant argues (albeit briefly) that we have discretion to consider a new theory for the first time on appeal when it raises a question of law presented on undisputed facts. (See, e.g., *People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3.) Here, however, the facts are not undisputed; it is conceivable that, if defense counsel had objected, the prosecution would have been able to introduce additional evidence as to why the identification was

---

**2**      One officer told him that "[s]everal subjects matched that description[.]"

7

reliable (see *post*). In any event, our discretion to consider a new theory cannot be exercised so as to override the statutory command of Evidence Code section 353. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; *People v. Viray* (2005) 134 Cal.App.4th 1186, 1210.)

Accordingly, we can consider defendant's claim only as a matter of ineffective assistance of counsel.

"When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the

8

identification.' [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 235, petn. for cert. filed Mar. 28, 2015.)

"Because human beings do not look exactly alike, differences are inevitable. The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him. [Citation.]" (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.)

In *People v. Cunningham* (2001) 25 Cal.4th 926, an eyewitness described a robber to police as having glasses and a beard and wearing a suit. (*Id*. at p. 960; see also *id*. at p. 958.) The California Supreme Court held that a photo lineup shown to that eyewitness was not unduly suggestive, even though in it, the defendant was the only person with glasses and a beard wearing a suit: "[A]ll six men are wearing glasses; at least one of the other men is dressed in a three-piece suit, and another is wearing a suit jacket. All of the men have a mustache and some have other facial hair. Several have a hairstyle similar to that of defendant. Defendant was not the tallest, shortest, oldest, or youngest of the participants. His photograph was similar to that of the others. [Citation.]" (*Id*. at p. 990.)

We have viewed the photo lineup in this case, and we do not consider it to be unduly suggestive. Defendant is not visibly taller, shorter, older, or younger. He does not have the lightest or the darkest skin. Five of the men, including defendant, have closely cropped hair framing the forehead in a squarish shape. Four of the men, including defendant, are wearing white t-shirts. Three of the men, including defendant, are clean-shaven; three have facial hair. As Chambers had not said one way or the other whether

9

the driver had facial hair, this was appropriate. Defendant is not the only one with the tattoo; in fact, the tattoo on the other man is more prominent. This leaves us with the fact that defendant was the only man shown who had tattoos on both the face and neck. However, his neck tattoos do not stand out. In sum, if the combination of a suit, glasses, and a beard on the defendant in *Cunningham* did not make the photo of him stand out, then the combination of face and neck tattoos did not make defendant stand out here.

Separately and alternatively, even assuming the photo lineup was unduly suggestive, the identification was nevertheless reliable.

Chambers had an unobstructed view of the driver from 10 to 15 feet away for about four minutes. At one point, the driver looked directly at him. Chambers's prior description, while not detailed, was sufficiently accurate to enable officers to single out defendant. Chambers was "a hundred percent sure" of his identification.[3] And defendant concedes that "the reliability of the pretrial identifications . . . probably would not have been affected by the lapse of time between the offense and the identification, as it was the same day."

In addition, Chambers specifically testified that his identification was not influenced by the selection of photos:

---

[3] Defendant argues that empirically, the certainty of an identification is unrelated to the correctness of that identification. Even if so, we are bound to follow the California Supreme Court's holdings stating that certainty is legally relevant. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In any event, even assuming this factor is irrelevant, all the other factors point in the same direction.

10

"Q  So, based upon your description, [defendant] is the only person that fit the identification that you gave to the police prior to being shown the photographic lineup?

"A  That, and he is very distinctive looking.  I remembered what he looked like."

Finally, Chambers's identification of defendant was corroborated by his identification of Session, who was in the same gang as defendant and who was seen with defendant at the Best Western; a second eyewitness also identified Session.

Because the photo lineup was not unduly suggestive, and because the identification itself was reliable, any objection to the identification would have had to be overruled. Thus, defense counsel did not render ineffective assistance by failing to object.

III

FAILURE TO OBJECT TO THE GANG EXPERT'S TESTIMONY TO HEARSAY

Defendant contends that his trial counsel rendered ineffective assistance by failing to object when the gang expert testified to assertedly inadmissible hearsay.

A.	*Additional Factual and Procedural Background.*

The gang expert testified that he had talked to Session, and Session had told him that defendant was "one of his closest homeboys."  These conversations "play[ed] a role" in his opinion that Session and defendant were both members of Edgemont.

He also testified:

"Q  . . . [W]as there a contact or an attempted contact made with Mr. Session in January of this year?

11

"A  Yes.  Officers went to [defendant]'s house and Mr. Session ran out the back and a foot pursuit ensued.  They eventually ended up catching Session, but he came out of [defendant's] house."

Defense counsel did not object to any of this evidence.

B.      *Analysis*.

Once again (see part II.B, *ante*), defense counsel forfeited any error in admitting the challenged evidence by failing to object.  Accordingly, once again, we can consider defendant's claim only as a matter of ineffective assistance of counsel.

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.  It is particularly difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.  [Citations.]"  (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

Defendant cannot show that there could be no satisfactory explanation for his counsel's failure to object.  He claims that the gang expert's testimony violated the federal confrontation clause as construed in *Crawford v. Washington* (2004) 541 U.S. 36. That is possible only if the gang expert recounted *testimonial* hearsay.  (*Id*. at pp. 51-53,

55-56, 59.) The introduction of *nontestimonial* hearsay does not offend the confrontation clause. (*Davis v. Washington* (2006) 547 U.S. 813, 824-826.)

"'[A]lthough the high court has not agreed on a definition of "testimonial," testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 705.) Not all statements made to a police officer are necessarily testimonial. (*Davis v. Washington*, *supra*, 547 U.S. at p. 828.)

On this record, defendant cannot show that the asserted hearsay was testimonial. First, the gang expert testified to Session's statement that defendant was "one of his closest homeboys." There is no evidence of the circumstances in which Session made this statement. Defendant even concedes, "It is not clear why [the gang expert] was interviewing Session," but, he argues, "one could assume from context that it concerned past criminal activity." It is at least possible, however, that the statement was clearly not testimonial. And if defense counsel knew it was not, then he had objectively reasonable grounds for failing to object.

Second, the gang expert testified that officers had located Session at defendant's house and had chased him. Once again, it is not clear that this was based on testimonial hearsay. In fact, it is not clear that it is based on hearsay at all; for all the record reflects,

13

the gang expert may have been present.[4]  Thus, again, defendant cannot show that defense counsel's failure to object was objectively unreasonable.

Separately and alternatively, defendant also cannot show that the asserted ineffective assistance was prejudicial.  He argues that the "key issue" at trial was identity; the challenged evidence tended to link defendant to Session, who had been identified as the shooter, and thus to support Chambers's identification of defendant as the driver.  However, defendant was already linked to Session by the surveillance video showing them both at the Best Western.  They were further linked by the gang expert's testimony that they were both members of Edgemont.  Thus, there is no reason to suppose that, even if the challenged evidence had been excluded, defendant would have enjoyed a more favorable outcome.

We therefore conclude that defense counsel's failure to object to the assertedly inadmissible hearsay did not constitute ineffective assistance.

---

[4]     On cross-examination, the gang expert testified:

"Q  . . . [D]id you actually participate in any of the interviews *in this case* in coming to your conclusions, or were — is your summary based upon just reading reports?

"A  It's on the reports.  I didn't participate in the interviews."  (Italics added.)

In light of the italicized qualification, "in this case," we do not understand this to rule out the possibility that he relied on his personal investigations in other cases.

14

IV

FAILURE TO OBJECT TO PROSECUTORIAL ERROR IN CLOSING ARGUMENT

Defendant contends that his trial counsel rendered ineffective assistance by failing to object to prosecutorial error in closing argument.

A.  *Additional Factual and Procedural Background.*

In closing argument, the prosecutor stated:  "[Chambers i]s testifying under oath. It's a felony to lie.  And, you know, defense will probably bring up the fact that he's facing his own felony charges.  Well, he's not perfect.  But you know what else he isn't? He's not a liar.  He's not a liar, and they're not going to be able to tell you that he is. When he testified he told us the truth."

He also stated:  "Several guys match that description.  Well, let's narrow that down then.  We know the driver and the shooter were yelling out things associated with Edgemont.  We know there's about a hundred guys in Edgemont.  Several — okay, fine. Several in Edgemont match that description.  Let's say 10.  How many of those 10 have every single shred of evidence, every single shred of evidence pointed at them[?]  None. Only the defendant.  Remember that."

Defense counsel did not object to these statements.

B.  *Analysis.*

"""""A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial

15

fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]" [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm.' [Citation.]" (*People v. Adams* (2014) 60 Cal.4th 541, 568-569.)

"'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

Yet again (see parts II.B and III.B, *ante*), defense counsel forfeited this contention by failing to object. When an issue of prosecutorial error has been forfeited, an appellate court can reach the merits of the issue in order to reject it (*People v. Williams*, *supra*, 17 Cal.4th at p. 161, fn. 6, citing *People v. Berryman* (1993) 6 Cal.4th 1048, 1072-1076 and *People v. Ashmus* (1991) 54 Cal.3d 932, 975-976); however, we know of no authority permitting us not only to reach the merits but also to reverse on this ground.

16

We therefore consider only whether defense counsel's failure to object to the asserted prosecutorial error constituted ineffective assistance.

First, defendant argues that the prosecutor's statement that Chambers was "not a liar" constituted improper vouching.

"'"It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]"' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 822.)  Consistent with this principle, "[a] prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record.  [Citations.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 958.)

Defendant relies on *United States v. Kerr* (9th Cir. 1992) 981 F.2d 1050, which held that the following statements regarding various witnesses constituted improper vouching:

"'I think he . . . was very candid.'

"'I don't think it was a pat story, because there are variations.'

"'I think he . . . was candid.  I think he was honest.'

"'[A named witness] was candid with you folks.'

"'The question is, were they hoodwinking you when they testified?  I think not.'"
(*Id.* at p. 1053.)

Here, however, the prosecutor did not use the word "I"; he did not urge the jurors to accept that Chambers was credible based on his personal belief.  Rather, he went on to argue that Chambers's testimony "rings true," "[i]s consistent," and is "backed up . . . by all of the other evidence[.]"  His assertion that Chambers was not a liar was entirely permissible as a reasonable inference from the evidence.

Second, defendant argues that the prosecutor's statement that "[l]et's say 10" members of Edgemont matched Chambers's description stated facts not in evidence.

"""[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." [Citations.]' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.)  Here, however, the gang expert had testified that there were approximately 100 members of Edgemont.  In addition, there was evidence that "[s]everal suspects" matched the description given by Chambers.  The prosecutor simply argued that it was a reasonable inference that not more than 10 Edgemont members were light-skinned Black males with face and neck tattoos.  He then argued that not a "shred" of other evidence pointed to these 10 Edgemont members.  In other words, in addition to Chambers's description, which applied only to a handful of people, there was other evidence pointing specifically to defendant.  This was permissible.

Because there was no prosecutorial error, defense counsel did not render ineffective assistance by failing to object.

## V

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

CODRINGTON
J.